USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _3/12/19_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TAMETRA LASHA CONYERS

        Plaintiff,

-against-

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

17-CV-05126 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

        Plaintiff Tametra Lasha Conyers filed this action pursuant to § 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. § 1383(c)(3), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI). The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 13) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 17, 23.) For the reasons set forth below, plaintiff's motion will be granted, defendant's motion will be denied, and the case will be remanded to the Commissioner for further proceedings.

**I.    BACKGROUND**

    **A.    Procedural Background**

        Plaintiff applied for SSI on May 13, 2011, alleging disability since February 4, 2011, due to a herniated disc, knee pain, asthma, high blood pressure, and depression. *See* Certified Administrative Record (Dkt. No. 13) (hereinafter "R. __") at 356, 388. The Social Security Administration (SSA) denied her application on November 17, 2011. (R. 217-20.)

        Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), and on September 14, 2012, she appeared, with counsel, before ALJ Seth Grossman. (R. 146-88.) Plaintiff appeared again, with counsel, on June 28, 2013. (R. 95-145.) The ALJ also took testimony from

non-examining medical expert (ME) Malcolm Brahms, M.D. and vocational expert (VE) Yaakov Taitz. (*Id*.) On July 26, 2013, the ALJ issued an unfavorable decision (the 2013 Decision) finding that plaintiff had the residual functional capacity (RFC) to perform unskilled sedentary work so long as she was limited to "at most occasional contact with supervisors, co-workers and the public," was given the "option to stand for 15 minutes after sitting for 45 minutes," and was not exposed to "concentrated pollutants and chemicals." (R. 194-207.) The ALJ concluded that, given plaintiff's age, education, work experience, and RFC, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 205.)

On August 9, 2014, the Appeals Council vacated the 2013 Decision and remanded the case to the ALJ. (R. 213-15.) The Appeals Council found that the ALJ (i) failed adequately to explain the weight he gave to the opinion of plaintiff's treating physician Sireen Gopal, M.D.; (ii) failed to obtain Dr. Gopal's underlying treating notes; (iii) failed to discuss opinion evidence submitted by examining physician Anthony Greenidge, M.D. of Federation Employment & Guidance Services (FEGS); and (iv) failed to obtain adequate vocational evidence "regarding the extent to which the claimant's limitations erode the occupational base for sedentary work." (R. 213-14.)

On remand, the same ALJ held further hearings on February 4 and November 18, 2015. (R. 43-90.) During the November 18 hearing, the ALJ also took testimony from non-examining ME Ronald E. Kendrick, M.D. and VE Christine DiTrinco. On January 21, 2016, the ALJ once again issued an unfavorable decision (the 2016 Decision), this time finding that plaintiff had the RFC to perform sedentary work so long as she was limited to "at most occasional contact with supervisors, co-workers and the public," was given "simple tasks/instructions," and was not exposed to "concentrated pollutants and chemicals." (R. 22.) Although in his 2013 Decision ALJ Grossman found that plaintiff required an "option to stand for 15 minutes after sitting for 45

minutes," he did not incorporate that limit, or any sit/stand limits, into his 2016 Decision. (*Compare* R. 199 *with* R. 22.) The ALJ concluded that given the plaintiff's age, education, work experience, and 2016 RFC, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 30.)

On May 11, 2017, the Appeals Council denied plaintiff's timely request for review (R. 1-7), making the 2016 Decision final.

### B.     Personal Background

Plaintiff was born on August 14, 1977. (R. 356.) She was 33 years old on the date of her SSI application. She completed one year of college in 1999. (R. 389.) From 1996 through 2001, plaintiff was employed as a cashier, receptionist, and bank teller. (*Id*.) She attributed her physical impairments to a workplace injury in 2001 (R. 100, 431), which is also the last year in which she held gainful employment. (R. 378.)

In a Function Report completed on September 14, 2011, in connection with her application, plaintiff stated that she experienced pain and numbness in her extremities and lower back that diminished her ability to sleep without medication, sit, stand, walk, reach, bend, or lift anything weighing more than 12 pounds. (R. 406-14.) Plaintiff estimated that she could walk for only one block before stopping to rest, and noted that she used a back brace. (R. 411-12.) Plaintiff explained that she received help from her mother and aunt in caring for her two children, performing household chores, and attending to her personal needs, and that she went out only to walk her son to the school bus and attend medical appointments. (R. 405-408, 415.) She wrote that the pain was alleviated by Percocet (a narcotic analgesic), which she had been taking for 11 years and which worked "after 20 minutes." (R. 414-15.) She denied side effects from the medication. (R. 415.)

Turning to her mental impairments, plaintiff stated that she required reminders to attend appointments (R. 407), and did not know "how to deal with stressful things" (R. 413), but had no

trouble paying attention, finishing what she started, following instructions, remembering things, or getting along with those in authority. (R. 412-13.) She added that as a result of her impairments she had "no social life" and that her life was "full of pain and sadness." (R. 408-10.)

## II.    THE MEDICAL RECORD

### A.    MRIs

Plaintiff underwent two MRIs of her right knee and three studies of her lumbar spine during the period relevant to this action. The earliest MRI of the right knee, performed on May 2, 2011, showed small joint effusion with a longitudinal tear of the meniscus with bone marrow edema. (R. 707.) An MRI of the same knee performed on December 12, 2012 showed knee joint effusion, degenerative changes of the interior horn of the lateral meniscal, and chondromalacia of the patella, but no evidence of a meniscal tear. (R. 1011.)

MRIs of plaintiff's lumbar spine were performed on November 11, 2010, December 12, 2012, and April 11, 2014. The 2010 scan showed herniated discs at L4-L5 and L5-S1 with bilateral neural foraminal narrowing. (R. 705.) The 2012 MRI revealed a lobular disc herniation at L4-L5 impinging on the thecal sac and neural foramina bilaterally, and a broad lobular disc herniation at L5-S1 effacing the thecal sac and impinging upon the neural foramina bilaterally. (R. 1012.) By 2014, the imaging showed: (1) straightening of the lordosis (abnormal curvature); (2) disc bulging at T11-T12, L1-L2, and L2-L3; (3) posterior disc bulging at L3-L4, impressing on the thecal sac; (4) posterior disc herniation at L4-L5, impressing on the thecal sac, with a radial annular tear and central spinal stenosis with facet and ligamentous hypertrophy; and (5) retrolisthesis (backwards slippage of the vertebrae) at L5-S1, as well as posterior disc herniation with extrusion, impressing on the nerve root and the thecal sac, and with broad components extending peripherally into both neural foramen and nearly abutting the nerve root. (R. 1008-1009.) Central spinal stenosis was

present at L4-L5 and at L5-S1. (R. 1009.) Neural foraminal stenoses were also present at L5-S1. (*Id.*)[1]

## B.     Medical Opinion Evidence

### 1.     Consultative Examiner Dr. Bougakov

Psychologist Dimitri Bougakov, Ph.D., performed a consultative examination and psychiatric evaluation on October 7, 2011. (R. 662-65.) Plaintiff reported difficulty falling asleep, dysphoric mood, crying spells, loss of interest, low energy, concentration difficulties, and a diminished sense of pleasure, all of which she attributed to her "constantly being in pain," and also reported being forgetful about appointments and conversation. (R. 662.) During the mental status exam, plaintiff was cooperative and "related adequately." (R. 663.) Her thought processes were coherent and goal directed; her affect was dysphoric, anxious and labile; her mood was dysthymic; her attention and concentration were intact for counting and simple calculations; and her memory was mildly impaired, "related to emotional distress secondary to depression." (*Id.*)

Dr. Bougakov opined that plaintiff could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration and a regular schedule, make appropriate decisions, relate adequately with others, and deal with stress (on a limited basis), but was "somewhat limited" in her ability to learn new tasks and perform complex tasks. (R. 664.) He concluded that plaintiff's psychiatric problems did "not appear to be significant enough to

---

[1] Spinal stenosis is a narrowing of the spinal column, "which can put pressure on the nerves that travel through the spine," causing pain and other symptoms that "can worsen over time." Mayo Clinic, "Spinal Stenosis," available at https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited March 11, 2019). Neural foraminal stenosis is a narrowing of the neural foramina, which are "the small openings between the bones in your spine" through which nerve roots exit the spinal column. Healthline Media, "Neural Foraminal Stenosis," available at https://www.healthline.com/health/neural-foraminal-stenosis (last visited March 11, 2019). Compression of those nerve roots can lead to pain, numbness, or weakness. "The symptoms will usually start gradually and get worse over time." *Id.*

interfere with [her] ablility to function on a daily basis" and that her symptomology was "mild" and would "resolve" with appropriate treatment. (R. 664-65.)

### 2. State Agency Reviewer Dr. Apacible

As part of the SSA's original determination of plaintiff's application, state agency review psychiatrist Mariano Apacible, Jr., M.D. reviewed the then-available record evidence (including Dr. Bougakov's report) and completed a Mental Residual Functional Capacity Assessment on November 16, 2011. (R. 654-61.) Dr. Apacible assessed plaintiff with mild restrictions in her ability to perform activities of daily living (ADLs) and maintain concentration, persistence, and pace, but no restrictions with regard to social functioning, and no extended episodes of deterioration. (R. 654.) He stated that plaintiff "appears capable of following and understanding simple directions and instructions. She can perform simple tasks. She may have some difficulties dealing with stress." (R. 660.) He concluded that plaintiff "appears capable of performing unskilled, entry-level work." (*Id*.)

### 3. Examining Physician Dr. Greenidge

On February 14, 2012, Dr. Greenidge, a family practitioner, examined plaintiff and provided an opinion as to her work capacity as part of a FEGS Biopsychosocial Summary (R. 666-702.) Dr. Greenidge noted back and knee tenderness (R. 683) and assessed that plaintiff was limited to walking, climbing, standing, or bending no more than 1-3 hours during an eight-hour workday, but had no limitations in regard to sitting, kneeling, grasping, pulling, or reaching. (R. 684.) In Dr. Greenidge's opinion, plaintiff was able to lift, carry, pull, and push a maximum of 20 pounds, and required a low stress environment. (*Id*.)

### 4. Nurse Morrison - 2012

Psychiatric nurse-practitioner Brianna Morrison, P.M.H.N.P., saw plaintiff on a near-monthly basis for therapy and medication management from December 2011 through the end of

2013, and then bimonthly through mid-2014. On April 5, 2012, Nurse Morrison completed a Treating Physician's Wellness Plan Report (R. 944-45), stating that plaintiff's mood was "not yet stabilized" despite medication management, and that a "high stress environment/working environment is not conducive to plaintiff's mental health and can cause [her] to decompensate." (R. 945.) She opined that plaintiff would be temporarily unemployable for 6-8 months. (*Id*.)

On August 28, 2012, Nurse Morrison completed a Medical Assessment of Ability to Do Work-Related Activities. (R. 711-13.) She opined that plaintiff had "poor" or no ability to deal with the public, interact with supervisors, deal with stresses, maintain concentration, understand, remember, and carry out complex job instructions, or relate predictably in social situations. (R. 711-12.) She wrote that plaintiff had "difficulty concentrating due to depression," with "periodic lapses of short term memory loss," as well as "periods of anxiety and panic attacks." (R. 712-13.) However, Nurse Morrison observed that plaintiff complied with her medication regime and attended scheduled appointments. (R. 713.)

### 5.    Consultative Examiner Dr. Fkiaras

On October 22, 2012, plaintiff was seen by family practitioner John Fkiaras, M.D., for an internal medical consultative examination. (R. 716-26.) Plaintiff was unable to walk on her heels and toes and could only perform a partial squat, but used no assistive devices and had a normal gait. (R. 717.) She rose from a chair without difficulty. (*Id*.) She had slightly reduced flexion in the lumbar spine. (R. 718.) A straight leg raise test was negative. (*Id*.) No sensory deficits were noted and plaintiff had full strength in all extremities. (*Id*.)

In his typed narrative report (R. 716-19), Dr. Fkiaras opined that plaintiff had a moderate limitation in bending, squatting, lifting, climbing stairs, and standing, and should avoid smoke, dust, and known respiratory irritants secondary to her history of asthma. Dr. Fkiaris also completed, by hand, a Medical Source Statement of Ability to Do Work Related Activities. (R.

720-25.) On that form he opined that in an eight hour workday plaintiff could sit for up to two hours at a time, for a total of seven hours a day, could stand for up to 30 minutes at a time, for a total of one hour a day, and could walk for up to 20 minutes at a time, for a total of one hour per day. (R. 721.) Dr. Fkiaris stated that plaintiff could "occasionally" lift and carry up to 10 pounds and climb stairs and ramps, but could never climb ladders, balance, stoop, kneel, crouch, or crawl. (R. 720, 723.)

### 6. Nurse Morrison and Dr. Nwokeji - 2013

On April 29, 2013, Nurse Morrison completed a Medical Source Statement cosigned by psychiatrist Kinglsey Nwokeji, M.D. (R. 931-35.) Nurse Morrison and Dr. Nwokeji opined that plaintiff suffered from "neurotic depression," presented with a "sad affect and depressed mood," and would likely be absent from work more than three times a month. (R. 931-92.) They opined that plaintiff had slight limitations in her ability to carry out her ADLs; moderate limitations in maintaining social functioning; "constant" deficiencies in concentration, persistence or pace; and "repeated" episodes of deterioration or decompensation in work or work-like settings. (R. 934-35.) No specifics were provided.

### 7. Treating Physician Dr. Gopal - 2013

Sireen Gopal, M.D., who is board-certified in physical medicine and rehabilitation, provided regular pain management treatment to plaintiff, beginning in December 2012, and prepared a Medical Source Statement on June 25, 2013. (R. 937-943.) Dr. Gopal opined that plaintiff's pain was severe enough to "constantly" interfere with her attention and concentration; that she could sit for 15 minutes at a time before she needed to get up and walk about, for a total of no more than one hour of sitting per day; and that she could stand or walk for 30 minutes at a time, before needing to sit or lie down, for a total of no more than one hour of standing or walking per day. (R. 938-40.) Dr. Gopal stated that plaintiff could never stoop, and that she could only

occasionally use her hands for repetitive tasks such as reaching or fingering. (R. 941.) He also stated that plaintiff would likely be absent from work more than three times a month. (R. 943.)

### 8. Examining Physician Dr. Grubin

After the issuance of the 2013 Decision, plaintiff returned to FEGS on April 4, 2014, and was evaluated by Cindy Grubin, D.O. (R. 971-78.) Dr. Grubin opined that plaintiff could not stand more than 15 minutes at one time, could not walk more than 30 minutes at one time, should avoid kneeling, could not squat for more than 30 minutes to an hour at one time, and could not lift more than 10 pounds, but had no sitting limitations. (R. 971-72.)

### 9. Dr. Gopal - 2014

In a second Medical Source Statement, dated July 10, 2014, Dr. Gopal again assessed the level of pain that plaintiff experienced as a result of her back and knee impairments, opining that it "frequently" interfered with her attention and concentration; and that she could not sit, stand or walk for more than 15 minutes at a time before changing position, or for longer than one hour in total over the course of an eight-hour workday. (R. 994-96.) He added that plaintiff would need to spend time resting (that is, reclining in a supine position) over the course of an eight-hour day, in addition to regularly scheduled breaks every two hours. (R. 996.) Dr. Gopal stated that plaintiff could "occasionally" balance, lift up to 10 pounds, reach, and finger, but "never" stoop or bend backwards. (R. 997.) He estimated, again, that she would be absent from work more than three times per month. (R. 999.)

### 10. Nurse Morrison and Dr. Nwokeji - 2014

On September 25, 2014, Nurse Morrison completed another Medical Source Statement, which Dr. Nwokeji again co-signed. (R. 1001-05.) They diagnosed plaintiff with "bipolar depression/anxiety," stated that she continued to present with "sad affect and depressed mood," and predicted again that she would likely be absent from work more than three times per month.

(R. 1001-02.) They opined that plaintiff had slight limitations in her ability to carry out her ADLs and maintain social functioning; constant deficiencies in concentration, persistence or pace; and experienced repeated deterioration or decompensation in work or work-like settings. (R. 1004-05.) Once again, no specifics were provided.[2]

## C. Treatment Records

The record also contains over one thousand pages of treating notes and other medical records from multiple health care providers. Plaintiff and the Commissioner have each provided a summary of that evidence. *See* Pl. Mem. (Dkt. No. 18) at 1-17; Def. Mem. (Dkt. No. 24) at 1 (generally agreeing with plaintiff's "description of the relevant facts" but "supplement[ing] and clarify[ing] . . . as necessary for a full and fair presentation of the evidence"), 2-17. The Court adopts the parties' summaries, which do not conflict in any material way, for purposes of the issues raised in this action. I discuss the portions of the treatment records that are pertinent to the adjudication of this case in section V below.

## III. HEARING TESTIMONY

### A. September 14, 2012

Plaintiff first appeared before ALJ Grossman, with counsel, on September 24, 2012. (R. 147.) After a few moments of questioning regarding plaintiff's mental and physical symptoms, the

---

[2] The record also includes a Mental Residual Functional Capacity Assessment dated August 23, 2016, prepared by nurse-practitioner Nixon Cornay, N.P. and co-signed by Dr. Nwokeji, which plaintiff apparently submitted to the Appeals Council after the issuance of the 2016 Decision. (R. 39-43.) Nurse Cornay reported that plaintiff had moderate to extreme limitations with regard to many abilities required for employment, and opined that plaintiff would likely miss work five days each month as a result of her impairments. (*Id.*) He concluded that plaintiff could not work on a regular and sustained basis because she "continues to experience intense feeling of depression and anxiety as well as insomnia." (R. 42.) Neither party discusses the Cornay opinion in this Court.

ALJ adjourned the hearing for the purpose of obtaining additional medical records and scheduling plaintiff for medical and psychiatric consultative examinations. (R. 161, 171, 175, 180.)

**B.      June 28, 2013**

The hearing reconvened on June 28, 2013, after the SSA obtained additional medical records and plaintiff underwent a consultative examination by Dr. Fkiaras. (R. 97, 716.)[3] Plaintiff again appeared with counsel. With respect to her physical impairments, plaintiff testified that she experienced shooting pains from her back through her left leg and was unable to walk more than one block without sitting down to rest. (R. 102-03.) She said that she could only stand for 40 minutes or sit for 30 minutes in one setting, and that she could not perform an eight-hour workday – even if permitted to sit or stand at will – because she would be in pain by "the second hour." (R. 103-04.)

Plaintiff testified that she was "suffering from clinical depression" (R. 103), which manifested in crying spells and anxiety attacks, sometimes brought on by stress, that felt like "I'm about to have a heart attack," left her unable to breathe, and caused her hands to shake. (R. 107-08.) The attacks typically lasted 20 minutes, and the last one occurred the Monday before the hearing. (R. 108.) Her crying spells occurred "four days out of the week," usually in the morning. (R. 111.) She also testified that she took pills for anxiety and depression that helped her manage her symptoms. (R. 108, 112.) Later in the hearing, plaintiff testified that she saw psychiatrist Dr. Nwokeji once a month, for about an hour, and saw her therapist, Nurse Morrison, once a month for medication management. (R. 132-33.)

---

[3] Insofar as can be determined from the administrative record, no psychiatric consultative examination took place after the September 14, 2012 initial hearing. Prior to that hearing, on October 10, 2011, plaintiff underwent a consultative psychiatric examination by Dr. Bougakov. (R. 662-65.)

The ALJ then took the testimony of orthopedic surgeon Malcolm Brahms, M.D., via telephone. Dr. Brahms, who never saw the plaintiff, reviewed the November 11, 2010 MRI of her lumbar spine, the May 2, 2011 MRI of her right knee, and Dr. Fkiaras's October 22, 2012 report of his consultative examination (R. 115), which according to Dr. Brahms was "within normal limits" except for plaintiff's right knee. (R. 115-16.) Dr. Brahms opined that plaintiff was "able to do light activities," and added that "the impairment in the knee is surgically correctable." (R. 117.) When asked if plaintiff's complaints of pain were "credible," Dr. Brahms replied, "I think she does have pain in her back, yes." (R. 119.) He went on to testify that the fact that plaintiff had been prescribed Oxycodone (a narcotic analgesic) for her back pain was "terrible," because it is "an addictive drug," and "for her symptomology it is certainly over and above what is considered necessary." (*Id.*)

The ALJ presented VE Taitz with a hypothetical claimant who had plaintiff's background and education and was limited to unskilled sedentary work with occasional contact with supervisors, the public, and co-workers. (R. 122-23.) The VE testified that such a claimant could perform the job of addresser, document preparer, surveillance system monitor, or sack repairer. (R. 123-25.) The ALJ then narrowed the hypothetical by specifying that the claimant needed the option to stand after sitting for 45 minutes. (R. 126.) VE Taitz testified that such a claimant could do the job of document preparer, addresser, surveillance system monitor, and ticket counter. (R. 126.) VE Taitz did not discuss whether or to what extent the sit/stand option would erode the occupational base of any of those jobs.

## C.      February 4, 2015

After the Appeals Council remand, plaintiff appeared with counsel on February 4, 2015, for another hearing before ALJ Grossman. (R. 71.) Plaintiff testified that because of her knee and back problems she "can't sit or stand too long." (R. 74.) The ALJ then asked her about various

health care providers and engaged in a discussion with her lawyer about the need to subpoena additional medical records. (R. 74-81.) During the course of that discussion the ALJ asked plaintiff if she was familiar with Dr. Nwokeji:

A    I think that's the – the psychiatrist at –

Q    How many times have you actually seen him in your life?

A    I think twice, but I see Ms. Morrison. She's underneath him.

Q    All right. Where is this – you've seen this person twice in your life?

A    Yes.

Q    And he filled out a form saying you had marked – all these marked things, how nice.

A    I guess Ms. Morrison gave him her records because that's who I see once a month, Ms. Morrison.

(R. 80.)

Under questioning from the ALJ, plaintiff testified that she cooked (with the help of her 14-year-old son), cleaned her home, and helped her younger daughter with homework. (R. 82.) However, she testified that if she were given a job she would "end up . . . losing it" due to her physical and mental impairments. (R. 85-86.) She explained that "some mornings I wake up my back is killing me or I'm in a really bad depression where I don't want to get out of bed." (R. 86.) The ALJ then adjourned the hearing in order to subpoena additional treating notes from her doctors. In addition, the ALJ stated, "I'm going to send your client out for internal medicine and a psychiatric." (R. 86.)[4]

---

[4] As noted above, the same thing happened during plaintiff's initial ALJ hearing on September 14, 2012. As a result, plaintiff was required to attend a total of four evidentiary hearings – two before the ALJ issued his 2013 Decision and two more before he issued the 2016 Decision now at issue. It is not clear to this Court why neither the SSA nor plaintiff's attorney was able to develop plaintiff's medical record more efficiently.

**D. November 18, 2015**

Nine months later, on November 18, 2015, plaintiff appeared for a fourth time before ALJ Grossman (R. 45), who noted that she had failed to appear for her consultative examinations. (R. 46-47.)[5] Plaintiff then testified, consistently with her past statements, that she cooked and cleaned; that her son (by then 15 years old) helped her care for her 7-year-old daughter; that she did not take public transportation by herself because of pain; and that she was not able to work because "[m]y back be killing, depression." (R. 50-51.) She explained, "I can't sit too long, I can't stand too long. I don't – I'm not even able to walk one block." (R. 52.) She testified that her son did the shopping for her, helped with the cleaning, and lifted things that were too heavy for her, meaning "over 12 pounds." (R. 53-54.) In response to questions from her own attorney, plaintiff clarified that she could not lift a full gallon of milk (which weighs approximately 8.6 pounds), because it would "cause sharp pains." (R. 55.) Plaintiff stated that she spent "the majority of the day" lying down, and could only sit in an office chair for "an hour." (R. 56-57.)

The ALJ then swore in retired orthopedic surgeon Dr. Kendrick,[6] who testified by telephone and based his opinion on the record rather than any personal examination of the plaintiff. (R. 57-58.) Dr. Kendrick reviewed the results of plaintiff's November 11, 2010 lumbar spine MRI, her December 12, 2012 right knee MRI, and the consultative report of Dr. Fkiaras. (R. 58.) He noted that plaintiff had decreased sensation in the right leg (which he characterized as not "particularly significant" because she had normal muscle strength in the upper and lower extremities on examination) and reduced lumbar motion "due to her pain." (R. 59.) Thereafter, in

---

[5] Both plaintiff and her counsel indicated that they were not aware of the appointments. (R. 46-47.)

[6] Dr. Kendrick was licensed to practice medicine by the State of Ohio, but retired in 2006 "from active clinical practice." (R. 1596.)

response to a suggestive question from the ALJ (and over an objection from plaintiff's counsel), Dr. Kendrick testified that "absent her pain" plaintiff could "easily" perform the requirements of light work. (R. 60.)[7] On examination by plaintiff's counsel, Dr. Kendrick testified that the objective evidence in the MRIs showed conditions that "could" cause pain, although "[u]sually not" enough pain to prevent a person from doing a sedentary job. (R. 62.)

Finally, ALJ Grossman examined VE DiTrinco. The ALJ presented a single hypothetical, asking the vocational expert to consider a claimant who was limited to the full range of sedentary work, simple task instruction, and occasional contact with coworkers, supervisors, and the public. (R. 64.) VE DiTrinko testified that the hypothetical claimant could perform the job of table worker, lens inserter, and final assembler. (R. 65.) On examination by plaintiff's counsel, the VE testified that if the hypothetical claimant were half an hour late, twice a week, she could not perform these jobs. (R. 66.)

## IV.    THE ALJ's DECISION

### A.    Standards

A claimant is "disabled," within the meaning of the Act, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20

---

[7] The ALJ's question was, "From an objective standpoint, should she be able or not able to do the full range of light work?" (R. 59.) Counsel objected to the question on the ground that the SSA's Hearings, Appeals, and Litigation Law Manual (HALLEX) "says that [an ME] is not to testify as to whether the client is disabled or the client's RFC." (R. 60.) Although counsel cited the wrong subsection of HALLEX, he was otherwise correct. HALLEX 1-2-6-70(E) states that "an ALJ may not ask an ME to . . .[d]ecide a claimant's RFC" or "determine whether a claimant is disabled." However, ALJ Grossman overruled the objection and asked the question again. (R. 60.) He later remarked, "I am well aware of the HALLEX and I'm well aware that we ask these questions all the time. . . . And I've never [had] a Court say we can't do it." (R. 62-63.)

C.F.R. § 416.905(a). In order to determine whether a claimant over the age of 18 is disabled within the meaning of Act, the Commissioner is required to apply a five-step evaluation process pursuant to 20 C.F.R. § 416.920(a)(4). In order, the steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014); *Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 416.920(a)(4).

The second step "is a threshold inquiry." *Martinez v. Comm'r of Soc. Sec.*, 2017 WL 9802837, at *9 (S.D.N.Y. Sept. 19, 2017) (quoting *Delia v. Comm'r of Soc. Sec.*, 433 F. App'x. 885, 887 (11th Cir. 2011)), applied "to screen out de minimis claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Thereafter, however, the ALJ considers the claimant's entire medical record, including impairments not deemed severe at step two. *Martinez*, 2017 WL 9802837, at *9 (citing *Jamison v. Bowen*, 814 F. 2d 585, 588 (11th Cir. 1987)); *see also* 20 C.F.R. § 416.923 (1991) ("we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").[8]

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any Listing), the Commissioner is required to assess the claimant's RFC "based

---

[8] 20 C.F.R. § 416.923 was amended effective March 27, 2017. In this Report and Recommendation, I quote and I apply the regulations as they existed at the time of the ALJ's Decision. Citations to these regulations – and to other regulations that have since been amended – include the date of the version that was in effect at that time.

on all the relevant medical and other evidence in [her] case record." 20 C.F.R. § 416.920(e); *accord* 20 C.F.R. § 416.945(a)(3). A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step to show "that other work exists in significant numbers in the national economy that [the claimant] can do, given [her] residual functional capacity and vocational factors." 20 C.F.R. § 416.960(c)(2). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

### B.    Application of Standards

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 29, 2011, the application date. (R. 20.)

At step two, the ALJ found that plaintiff suffered from the following severe impairments: hypertension, herniated discs of the lumbar spine, right knee impairment, asthma, and depressive disorder. (R. 20.)

At step three, the ALJ concluded that none of plaintiff's physical or mental impairments met or medically equaled the severity of any of the listed impairments. (R. 20.)

At step four, the ALJ concluded that plaintiff had the RFC to perform sedentary work, as defined in 20 C.F.R. § 416.967(a),[9] except:

---

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying

> [T]he claimant is limited to, at most, occasional contact with supervisors, co-workers and the public, simple tasks/instructions, and no exposure to concentrated pollutants and chemicals. For the above type jobs, the claimant can understand and carry out instructions, maintain attention and concentration, interact appropriately with supervisors, and co-workers and the public, and keep a regular schedule, all within normal work expectations.

(R. 22.)

In determining plaintiff's RFC, the ALJ found that although her medically determinable impairments could reasonably be expected to cause the pain and other symptoms she reported, her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (R. 23), because "there is no indication of physical therapy or surgical intervention" for her back and knee problems, for which her pain management specialist, Dr. Gopal, "recommended conservative treatment, namely physical therapy and injections for her knees." (R. 24.) The ALJ also noted that, although plaintiff presented with decreased ranges of motion and tenderness in the lower back and right knee, her physical examinations were mostly normal and revealed no sensory loss, no motor weakness, no edema, intact balance, gait, and coordination, and negative straight leg raise tests. (*Id.*) Citing a February 3, 2011 treating note (R. 530), the ALJ added, "The claimant also conceded that her back pain was relieved with heat, medication, and drugs." (R. 24.)

With respect to plaintiff's mental limitations, the ALJ cited another early treatment note – this one from September 2, 2011 (R. 491-95) – reflecting that plaintiff presented with "anxiety, confusion, difficulty concentrating, gait disturbance, inaccurate movements," and that her "overall appearance was intoxicated, slovenly, sleepy, and disoriented," which in the ALJ's view "indicate[d] a substance abuse issue." (R. 26.) However, treatment notes from 2012 through 2014

---

out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

showed that plaintiff was stable on her medications, presented with cooperative behavior, and that her mental status exams were consistently within normal limits. (R. 27.) The ALJ emphasized that plaintiff was able to attend to self-care, cook, drive, negotiate public transportation, care for her young daughter, watch television, read, and socialize, which suggested "a level of concentration and an ability to function at a level inconsistent with a finding of disability." (R. 27, 29.) He added that plaintiff "was a no show to two post hearing consultative examinations, without any adequate explanation, and that diminishes her credibility." (R. 29.)

In discussing the various medical opinions in the record, the ALJ gave "great weight" to the opinion of non-examining MEs Dr. Brahms and Dr. Kendrick, both of whom testified that "based upon the objective medical evidence, the claimant should be able to perform the full range of light work." (R. 29.)[10] The ALJ explained that both were board-certified orthopedic surgeons who had knowledge of the SSA's disability program, listened to the hearing testimony, reviewed the medical evidence of record, and gave "convincing reasons" for their opinions. (*Id*.) The ALJ singled out Dr. Kendrick's opinion for special notice, writing in bold, underlined text:

> **At the most recent supplemental hearing in November 2015, the impartial medical expert and orthopedic specialist, Dr. Kendrick, testified that the orthopedic examinations showed normal muscle strength, and range of motions, and that based on the objective medical evidence, the claimant should be able to perform sedentary, light, and even medium work.**

_____

[10] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b).

(R. 26.)[11]

The ALJ gave "significant weight" to the portions of consultative examiner Dr. Fkiaris's opinion finding that plaintiff could lift up to ten pounds, sit for up to seven hours, stand for up to one hour (up to 30 minutes continuously), and walk for up to one hour (up to 30 minutes continuously), because it was "consistent with his findings on examination and more than adequately takes in to account the claimant's allegations." (R. 29.) The ALJ gave "less weight" to the portion of Dr. Fkiaris's opinion that plaintiff was unable to balance, stoop, kneel, crouch, or crawl, and should avoid smoke, dust, and known respiratory irritants secondary to asthma, because it was "inconsistent with the narrative opinion, his findings on examination, and findings in treatment documentation." (R. 24-25, 29.)

The ALJ also assigned "significant weight" to the opinion of consultative psychologist Dr. Bougakov, who assessed that plaintiff's "mental illness did not appear to be significant enough to interfere with her ability to function on a daily basis," and to the opinion of state agency review psychiatrist Dr. Apacible that plaintiff "was capable of performing unskilled, entry-level work." (R. 27-28, 30.) The ALJ did not further explain the weight he assigned to these opinions.

"Limited weight" was assigned to the opinion of treating physician Dr. Gopal, plaintiff's pain management specialist since December 2012, because "the extreme limitations of not being able to sit, stand, or walk for more than one hour during an eight-hour workday are not supported by the relatively benign findings on examination, the objective medical evidence, and the plan for conservative treatment." (R. 29.) The ALJ also rejected the portion of Dr. Gopal's 2013 opinion finding that plaintiff could only occasionally use her hands for repetitive tasks such as reaching or

---

[11] In fact, Dr. Kendrick did not provide any testimony concerning "medium" work. The Commissioner suggests, in her brief, that the reference to medium work in the 2016 Decision was a typographical error. *See* Def. Mem. at 16 n.6.

fingering (R. 941), because "there is no indication in the record of any limitation regarding plaintiff's upper extremities." (R. 29.) However, the ALJ "consider[ed], to some extent, the opinion of treating physician Dr. Gopal," and gave plaintiff "the benefit of the doubt regarding subjective complaints of pain," in limiting her to sedentary rather than light work. (*Id.*)

The ALJ gave "little weight" to the opinions of Dr. Greenidge and Dr. Grubin at FEGS, because they did not have "a treatment relationship with the claimant, and their findings are inconsistent with findings on examination, and the claimant's reported activities of daily living." (R. 29.)

Finally, the ALJ assigned "little weight" to the opinions of Nurse Morrison, noting that a nurse practitioner is "not an acceptable medical source, and more importantly . . . [her] opinions are inconsistent with the evidence of record." (R. 30.) Even "less weight" was accorded to the assessments cosigned by Dr. Nwokeji, because they "conflict with the claimant's consistent presentation upon mental status examinations." (*Id.*) The ALJ noted that Nurse Morrison's treatment notes consistently reflected "cooperative behavior, with normal psychomotor activity, intact memory, average intelligence, good attention, good reasoning, good impulse control, good judgment, good insight, and logical thought process." (R. 28, 30.)

At step five, on the basis of the VE's testimony, the ALJ concluded that plaintiff had the RFC to perform a significant number of jobs in the national economy, including table worker, lens inserter, and final assembler (R. 31), and therefore that she was not disabled.

V.    **ANALYSIS**

A.    **Standard of Review**

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842

F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (Nov. 2, 2015). The reviewing court may set aside a decision of the Commissioner only if it is "based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). In doing so, "the Court must affirm the decision of the Secretary even if there is also substantial evidence for plaintiff's position." *Gernavage v. Shalala*,

882 F. Supp. 1413, 1417 n.2 (S.D.N.Y. 1995) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982); *accord Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). Thus, the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Thus, remand may be appropriate if the ALJ fails to provide an adequate "roadmap" for his reasoning. But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). *See also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.") (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)).

## B.     The Parties' Contentions

Plaintiff does not challenge the ALJ's analysis at steps one, two, or three. She does challenge his RFC determination, arguing principally that he erred in failing to assign controlling weight, or at least more weight, to the opinions of psychiatrist Dr. Nwokeji, Nurse Morrison, and treating physician Dr. Gopal. Pl. Mem. at 18-22; Pl. Reply Mem. (Dkt. No. 25) at 1-4. Plaintiff

also contends that the ALJ failed to consider the side effects of her medications on her RFC. Pl. Mem. at 22-25.

In response, the Commissioner argues generally that the ALJ's RFC determination was free of legal error and supported by substantial evidence. Def. Mem. at 18-25. She contends that the ALJ properly discounted Dr. Gopal's opinion for substantially the reasons given in the 2016 Decision, *id*. at 18-20, and because it was inconsistent with other opinion evidence in the record, such as Dr. Fkiaras's consultative opinion and the testimony of Drs. Brahms and Kendrick. *Id*. at 20-21. She further contends that Dr. Nwokeji "was not entitled to the special deference afforded to treating sources because he did not treat her," *id*. at 22, and that Nurse Morrison was not "an acceptable medical source whose opinion could be entitled to controlling weight." *Id*.

I agree with the Commissioner that the ALJ did not err in discounting the opinions of Nurse Morrison and Dr. Nwokeji. Plaintiff did not establish that Dr. Nwokeji was her "treating physician," and the parties agree that Nurse Morrison was not an "acceptable medical source," as those terms are used in the applicable SSA regulations. Moreover, the opinions of Dr. Nwokeji and Nurse Morrison concerning plaintiff's mental impairments lacked internal support and were inconsistent in material respects with the underlying treating notes. They were also inconsistent with other evidence in the record, including Dr. Bougakov's findings on examination, his consultative report, and plaintiff's Function Report.

Nor did the ALJ err in failing to explicitly discuss the side effects of plaintiff's narcotic medications. Although the Medical Source Statements signed by Dr. Nwokeji and Nurse Morrison opined that those medications made plaintiff drowsy and lethargic (a point which, if accepted by the ALJ, could affect her RFC), plaintiff herself repeatedly denied, over a period of years, that she experienced those (or any other) side effects. The ALJ was within his rights to take her at her word.

However, I agree with the plaintiff that the ALJ improperly weighed the opinion evidence concerning plaintiff's physical impairments, and that this error requires remand. In particular, the ALJ failed to give good reasons for crediting the brief and conclusory testimony of Dr. Kendrick, a non-examining ME who may or may not have reviewed all of the underlying objective evidence, over the written opinions of every doctor who actually examined the plaintiff, including Dr. Gopal, her treating physician. The ALJ also failed to explain why, in the face of objective evidence indicating a worsening of plaintiff's spine impairments, he concluded that she was more functional in 2016 than in 2013, and made non-trivial factual errors regarding the medical and non-medical evidence in the record. Given these deficiencies, the record lacks substantial evidence to support the ALJ's finding as to plaintiff's RFC or his ultimate conclusion that she was not disabled.

**C.      The ALJ Did Not Err in Evaluating the Opinions of Dr. Nwokeji and Nurse Morrison**

**1.      The Treating Physician Rule**

An ALJ is required to give controlling weight to the opinion of a claimant's treating physician so long as that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2) (2012). A treating physician is the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [her], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [her]." 20 C.F.R. § 416.902 (2011). The rule recognizes that a treating physician is "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2) (2012); *see also Mongeur v. Heckler*, 722 F.2d 1033,

1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Where mental health treatment is at issue, the "longitudinal picture" takes on added significance. *Rodriguez v. Astrue*, 2009 WL 637154, at *26 (S.D.N.Y. March 9, 2009). "A mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *accord Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015).

If the ALJ does not assign controlling weight to the opinion of a treating physician, he must give "good reasons" for doing so, and "comprehensively set forth [the] reasons for the weight assigned" to the opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also* 20 C.F.R. § 416.927(c)(2) (2012) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). In particular, the ALJ must "explicitly consider . . . (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. § 416.927(c)(2)(i)-(ii) (2012) (ALJ must consider length of treatment relationship, frequency of examination, and how much "knowledge a treating source has about your impairment(s)"). "[F]ailure to provide good reasons for not crediting the

opinion of a claimant's treating physician is a ground for remand." *Greek*, 802 F.3d at 375; *Halloran*, 362 F.3d at 33.

### 2. The Treating Physician Rule Does Not Apply to the Opinions of Dr. Nwokeji and Nurse Morrison

There is no documentary evidence in the extensive administrative record – and very little evidence of any kind – that plaintiff had an "ongoing treatment relationship," 20 C.F.R. § 416.902 (2011), with Dr. Nwokeji. On February 4, 2015, plaintiff testified that she had seen Dr. Nwokeji "twice" in her life. (R. 80.) Even that assertion is uncorroborated by any treating records.[12] Nurse Morrison's treating notes make no mention of Dr. Nwokeji. She did not even use Dr. Nwokeji's name when she wrote, on October 12, 2012, that plaintiff had made a request for "SSI paper work to be completed . . . and cosigned by MD." (R. 750.)

The fact that Dr. Nwokeji later provided the requested co-signature did not make him plaintiff's treating physician, and certainly did not demonstrate that he had "a rich and nuanced understanding of the patient's health," *Bodden*, 2015 WL 8757129, at *9, or was "able to provide a detailed, longitudinal picture" of her condition. 20 C.F.R. § 416.927(c)(2) (2012). Therefore, the ALJ was not required to give Dr. Nwokeji's opinions the controlling weight or heightened deference due to the opinions of a treating physician. *See Mongeur*, 722 F.2d at 1039 n.2 (opinion of physician "who only examined Mongeur once or twice" was not "entitled to the extra weight of that of a 'treating physician'"); *Garallua v. Comm'r of Soc. Sec.*, 2018 WL 4233813, at *16 (S.D.N.Y. Feb. 1, 2018) (ALJ had "good reasons" for declining to afford controlling weight to Dr.

---

[12] Since both Nurse Morrison and Dr. Nwokeji worked at the same facility (usually referred to in the record as the Clay Avenue Health Center, but sometimes as "Promesa," *see* R. 78), the treating records produced by that facility in response to the SSA's subpoenas (*see, e.g.*, R. 727, R. 1531) should have included Dr. Nwokeji's treating notes, if any existed.

McCurtis's opinions where there was no evidence that Dr. McCurtis was plaintiff's treating physician), *report and recommendation adopted*, 2018 WL 4356728 (S.D.N.Y. Sept. 12, 2018).[13]

Similarly, the treating physician rule does not apply to Nurse Morrison. Although she had an ongoing treatment relationship with plaintiff – evidenced by treating notes reflecting monthly appointments from late 2011 through 2013 and bi-monthly appointments in 2014 – she is not an "acceptable medical source" as that term is used in the regulations implementing the Act. *See* 20 C.F.R. § 416.913(a) (2013) ("acceptable medical sources" include physicians, optometrists, podiatrists, and speech-language pathologists); 20 C.F.R. 416.927(a)(2) (2012) (defining "medical opinions" as opinions from acceptable medical sources). *See Mongeur*, 722 F.2d at 1039 n.2 ("the diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician"); *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (opinions of physician's assistant and nurse practitioner "do not demand the same deference as those of a treating physician"); *Wider v. Colvin*, 245 F. Supp. 3d 381, 388 (E.D.N.Y. 2017) ("the statutes and case law are clear that nurse practitioners cannot issue medical opinions").

### 3. The ALJ Properly Discounted the Opinions of Dr. Nwokeji and Nurse Morrison

Only the opinions of treating physicians are entitled to the presumption of controlling weight. However, because an ALJ is required to evaluate "every medical opinion" in the record, 20 C.F.R. § 416.927(c) (2012), my determination that neither Dr. Nwokeji nor Nurse Morrison

---

[13] In her reply brief, plaintiff asks the Court to "presume[e]" that Dr. Nwokeji was plaintiff's treating psychiatrist because he signed Medical Source Statements concerning her impairments, "and there is nothing in the record that contradicts this presumption." Pl. Reply Mem. at 2. According to plaintiff, Nurse Morrison "[o]bviously . . . reported to Dr. Nwokeji regarding plaintiff's treatment," and that there is "no other explanation for why Dr. Nwokeji's name would appear on plaintiff's assessment in two separate years." *Id.* The short answer to both of these (somewhat inconsistent) contentions is that neither the ALJ nor the district court is required to accept the plaintiff's speculation as to whether a physician *might* have treated her – or supervised her treatment – where the fully-developed record fails to establish either fact.

qualified as plaintiff's treating physician does not wholly answer the question whether the ALJ erred by assigning "little" and "less" weight to their views.

"Generally," more weight is due to the opinion of a medical source who has examined the claimant than to the opinion of a non-examining expert. 20 C.F.R. § 416.927(c)(1) (2012). Other factors bearing on the proper weight to be given a medical opinion from a non-treating source include whether it is supported by "relevant evidence" and "supporting explanations," whether it is consistent "with the record as a whole," and whether the source is a specialist in the relevant field. 20 C.F.R. § 416.927(c)(3)-(5) (2012). In addition, the ALJ may – but is not required to – consider opinions from "other sources," including nurse practitioners, bearing on the severity of an impairment and how it affects the claimant's ability to work. 20 C.F.R. § 416.913(d)(1) (2013); *see also Genier*, 298 F. App'x at 108 (ALJ was "free to consider" opinions of physician's assistant and nurse practitioner but was also "free to discount [their] assessments" in favor of those by physicians).

Under these standards, I cannot fault the ALJ's decision to discount the opinions of Dr. Nwokeji and Nurse Morrison. (R. 30.) Their first Medical Source Statement, dated April 29, 2013, asserted that plaintiff suffered from "neurotic depression" (R. 931); that her medications caused side effects including "drowsiness" and "lethargy"; that plaintiff had "marked" limitations in a wide range of work-related areas and endured "constant" deficiencies of concentration, persistence, and pace (R. 932-34); and that she had experienced "repeated" episodes of deterioration or decompensation in work or work-like settings. (R. 934-35.) Their second Medical Source Statement, dated September 25, 2014, diagnosed plaintiff with "bipolar depression" (R. 1001); continued to list "lethargy" and "drowsiness" as medication side effects (R. 1002); and once

again assessed plaintiff with a variety of "marked" limitations, "constant" deficiencies of concentration, persistence, and pace; and "continual" episodes of decompensation. (R 1003-05.)

Nurse Morrison's underlying treatment notes, however, present a different picture. Her notes from April 16, 2013 (plaintiff's most recent appointment before the April 29, 2013 opinion) list plaintiff's diagnosis as "anxiety associated with depression" (R. 1356); note plaintiff's denial of any adverse side effects from her medication (*id*.); and reflect an unremarkable mental status exam, during which plaintiff's behavior and appearance were appropriate, her speech was clear, her affect was appropriate, her mood was euthymic, her memory was intact, her attitude was cooperative, her reasoning, impulse control, judgment, and insight were fair, her thought processes were logical, and her thought content was unremarkable. (*Id*.) At her June 3, 2014 appointment with Nurse Morrison, plaintiff carried the same diagnosis ("anxiety associated with depression"), showed "moderate improvement" in response to her medications, denied adverse side effects, and once again had an unremarkable mental status exam. (R. 1646.) Nurse Morrison's treating notes do not describe even a single episode of deterioration or decompensation in work or a work-like setting, and I have been unable to find any such evidence elsewhere in the record.

ALJ Grossman therefore did not err in finding Dr. Nwokeji's assessments "inconsistent with the treatment notes." (R. 28.) Moreover, the mental status exams summarized above were typical of plaintiff's course of treatment with Nurse Morrison. As the ALJ noted (R. 30), plaintiff "consistently exhibited cooperative behavior, with normal psychomotor activity, intact memory, average intelligence, good attention, good reasoning, good impulse control, good judgment, good insight, and logical thought processes." (*See* R. 735, 743, 755-56, 769, 782-83, 801, 829, 842-43, 858, 883, 1347, 1356, 1365, 1374-75, 1383-84, 1392-93, 1566, 1625, 1635, 1646.) Nurse Morrison frequently noted improvement of plaintiff's psychological symptoms with medication (R. 1383,

1392, 1401, 1412, 1422), and in 2014 she reduced plaintiff's appointments to once every two months. (*See*, *e.g.*, R. 1626, 1636, 1647.)

Dr. Nwokeji's opinions were also inconsistent with other evidence in the record, including plaintiff's Function Report, in which she stated that she had no trouble paying attention, finishing what she started, following instructions, remembering things, or getting along with those in authority (R. 407, 412-13), and the opinion of consultative examiner Dr. Bougakov, who personally examined the plaintiff and concluded that her work-related mental impairments were relatively mild. (R. 662-65.) On these facts, the ALJ did not err in assigning significant weight to Dr. Bougakov's opinion. Nor, given the entire record, did he err in incorporating Dr. Bougakov's findings into his RFC determination, which limited plaintiff to jobs involving "occasional contact with supervisors, co-workers, and the public" and "simple tasks/instructions." (R. 22.)[14]

To be sure, there is some evidence in the record that would support the conclusion that plaintiff had greater mental limitations than those the ALJ incorporated into his RFC determination. *See* Pl. Mem. at 23-24. But that is not the test. "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Johnson*, 563 F. Supp. 2d at 454.

---

[14] I would come to the same conclusion even if I applied the treating physician rule to Dr. Nwokeji's opinions. *See Legg v. Colvin*, 574 F. App'x 48, 49 (2d Cir. 2014) (summary order) (having "found a lack of evidence to support [the treating physician's] assessment, the ALJ was entitled to rely on statements by other physicians in the record"). *See also Alejandro v. Comm'r of Soc. Sec.*, 2018 WL 4328839, at *6 (S.D.N.Y. Sept. 11, 2018) ("An ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence.").

### D. The ALJ Was Not Required to Say More About the Side Effects of Plaintiff's Medications

When evaluating a claimant's pain and other symptoms, an ALJ is required to consider a list of seven factors, including "the type, dosage, effectiveness and side effects" of the claimant's medications. 20 C.F.R. § 416.929(c)(3)(iv) (2011). However, the ALJ need not "explicitly recite the seven relevant factors," as long as his "credibility determination was supported by substantial evidence in the record." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013); *see also Mongeur*, 722 F.2d at 1040 (remand is not required where "the evidence of record permits us to glean the rationale of an ALJ's decision").

In this case, although plaintiff testified at her fourth hearing, under questioning from her counsel, that her medications made her drowsy (R. 106, 112), her treatment notes show that she repeatedly and consistently denied those or any other side effects to her various health care providers. (*See*, *e.g.*, R. 735, 743, 755, 769, 782, 801, 828, 842, 858, 1022, 1025, 1028, 1032, 1036, 1039, 1042, 1347, 1356, 1374, 1383, 1392, 1566, 1624, 1635, 1646.) She also denied side effects in her Function Report. (R. 415.) The ALJ's failure to specifically so note, in his extended analysis of plaintiff's subjective reports of pain and related symptoms, does not require remand. *See Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 768 (S.D.N.Y. 2018) ("Given the lack of any medical records corroborating Martes's claimed side effects, we find no error in the ALJ's decision not to incorporate the side effects into a discussion of Martes's RFC or into the resulting RFC itself."); *Guilfuchi v. Comm'r of Soc. Sec.*, 2016 WL 128207, at *10 (S.D.N.Y. Jan. 12, 2016) ("Given that there was no medical evidence that the side effects of Guilfuchi's medication affected his residual functional capacity, it was not necessary for the ALJ to discuss the issue further.").

## E. The ALJ Improperly Weighed the Opinions of Treating, Examining, and Non-Examining Sources as to Plaintiff's Physical Impairments

Remand is required, however, for the ALJ to reconsider plaintiff's RFC after properly weighing the opinion evidence concerning her physical impairments. As noted above, the applicable regulations instruct ALJs to give the opinions of treating physicians "'controlling weight' in all but a limited range of circumstances." *Greek*, 802 F.3d at 376. Even within that "limited range of circumstances," the ALJ "generally" must weigh the opinion of a treating physician more heavily than the opinion of a consultative examiner, which in turn is entitled to more weight than the opinion of a non-examining expert. 20 C.F.R. § 416.927(c)(1)-(2) (2012); *see also Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); *Ridge v. Berryhill*, 294 F. Supp. 3d 33, 61 (E.D.N.Y. 2018) (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990)) ("The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.") (internal quotation marks omitted).

In this case, the ALJ took the opposite approach, giving "great" weight to the opinions of the two MEs, Dr. Brahms and Dr. Kendrick, who never saw the plaintiff (R. 29); "significant" weight to the opinion of consultative internist Dr. Fkiaras, who examined the plaintiff once (*id.*); and "limited" weight to the opinion of her treating physician, Dr. Gopal. (R. 25, 29.)[15] As a result of this weighing process, the ALJ concluded that plaintiff was capable of the full range of exertionally sedentary work with no other physical limitations. (R. 22.)

_____

[15] In addition, the ALJ gave "little" weight to the opinions of two other examining physicians, Dr. Greenidge and Dr. Grubin, each of whom saw plaintiff once and personally examined her. (R. 29.)

This aspect of the ALJ's RFC was supported *only* by the two non-examining MEs, each of whom expressed his view briefly, in conclusory terms – and neither of whom was asked about any of the specific functional limitations found by the physicians who personally examined the plaintiff. (R. 58-62, 115-17.) Each of those examining physicians, by way of contrast, opined that plaintiff had significant exertional, postural, or manipulative limitations secondary to pain – including limitations in her ability to sit, stand, walk, lift, carry, push, pull, stoop, climb, crawl, crouch, reach, and handle[16] – which, if credited, would either prohibit her from performing any work or restrict the range of sedentary work she could perform. The ALJ did credit those findings, in part, in the 2013 Decision. (R. 199.) In 2016, however, the ALJ rejected all of them – even those he previously accepted – in order to formulate the RFC now at issue. In so doing, the ALJ committed a series of errors.

### 1.    No "Good Reasons"

As the ALJ acknowledged, Dr. Gopal was a board-certified "pain management specialist." (R. 25.) Dr. Gopal treated plaintiff regularly, beginning in late 2012, and on that basis opined in July 2014 that her pain was severe enough to "frequently" interfere with her attention and concentration, and consequently that she could not sit, stand, or walk for more than 15 minutes at a time before changing position, would require extra rest (in addition to normal breaks) during the work day, and could not stoop. (R. 992-99.)

The ALJ rejected all of these limitations on the ground that they were not "supported by the relatively benign findings on examination, the objective medical evidence, and the plan for

---

[16] Limitations on sitting, standing, walking, lifting, carrying, pushing, and pulling are considered exertional limitations. 20 C.F.R. § 416.969a(b). Limitations on reaching, handling, stooping, climbing, crawling, or crouching are non-exertional postural or manipulative limitations. *Id.* § 416.969a(c)(1)(vi). Mental limitations (some of which the ALJ did incorporate into his RFC analysis) are also considered non-exertional. *Id.* § 416.969a(c)(1)(i)-(iv).

conservative treatment." (R. 29.) It is not clear, however, what other or different examination findings, objective evidence, or treatment plan would have "supported," to the ALJ's satisfaction, Dr. Gopal's assessment of plaintiff's pain, which in turn drove his opinions regarding her functional limitations. On examination, Dr. Gopal found lumbar and knee tenderness, a limited range of lumbar motion in all planes, slightly decreased strength at the hip abductors, decreased sensation along the right leg, an antalgic gait (that is, a limp caused by pain), and (at times) a positive McMurray test (for torn meniscus). (R. 1015-16, 1018-19, 1021-22, 1024-25, 1027-28, 1029-30, 1031-32, 1033-34, 1035-36, 1038-39, 1041-42.) Plaintiff's 2014 lumbar MRI showed herniated discs with nerve impingement, central canal stenosis, and neural foraminal stenosis. (R. 1008-09.) The 2012 MRI of her knee showed degenerative changes and chondromalacia of the patella. (R. 1011.) Dr. Gopal treated plaintiff's pain with analgesic medications, including opiates, ultrasound therapy, injections, and physical therapy (including home exercises), and prescribed a knee brace. (R. 1016, 1019, 1022, 1025, 1032, 1034, 1036, 1039, 1042.)

The ALJ does not explain why or in what way this evidence is inconsistent with Dr. Gopal's conclusions as to plaintiff's limitations, including limitations on sitting, standing, walking, and stooping. Nor could he, without improperly "substitut[ing] his own expertise or view of the medical proof for the treating physician's opinion." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)); *see also Greek*, 802 F.3d at 375 ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion."); *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (holding that ALJ improperly discounted treating physician's opinion based on lack of muscle spasm during exams, where ALJ "simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by Dr. Ergas in his assessment"); *Barrett v.*

*Berryhill*, 286 F. Supp. 3d 402, 427-28 (E.D.N.Y. 2018) (remanding where ALJ improperly discounted treating physician's opinion based on ALJ's own assessment that physician's findings were "essentially normal").

In this case, *all* of the physicians who opined on plaintiff's spine and knee conditions agreed that they caused pain – including both of the non-examining MEs,[17] who carefully refrained from assessing the *degree* of her pain, basing their own opinions as to her exertional capacity only upon the objective evidence.[18] There is thus no medical evidence in the record upon which the ALJ could rely to conclude that plaintiff's pain did not warrant any limitations upon sitting, standing, walking, or stooping. Moreover, it is well-settled that the opinion of a treating physician may not be "discounted merely because he has recommended a conservative treatment regimen." *Burgess*, 537 F.3d at 129; *see also Shaw*, 221 F.3d at 134-35 (reversing decision denying benefits where the ALJ improperly "imposed [his] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered"); *Owens v. Berryhill*, 2018 WL 1865917, at *6 (E.D.N.Y. Apr. 18, 2018) (collecting cases). The reasons that the ALJ gave for according "limited" weight to Dr. Gopal's 2014 opinion are therefore insufficient to overcome the treating physician rule or justify the ALJ's rejection of virtually all of the functional limitations found by Dr. Gopal. This error "by itself warrants remand." *Selian*, 708 F.3d at 419.

---

[17] Dr. Brahms testified, "I think she does have pain in her back, yes." (R. 119.) Dr. Kendrick volunteered that plaintiff's "reduced lumbar motion" was "due to the pain that she experiences," and agreed that the objective evidence on her MRIs "can cause pain, yes." (R. 59, 62.)

[18] Dr. Brahms testified that pain is "a subjective factor," not an "objective finding," acknowledged that he and plaintiff's treating physician might disagree about the severity of her symptoms, and stated, "I can't challenge what he says." (R. 120.) When the ALJ asked Dr. Kendrick if plaintiff could perform light work, the ME replied, "Well *absent her pain*, she could do that easily." (R. 60 (emphasis added).) When asked whether the objective evidence shown on plaintiff's MRIs would "normally" cause enough pain to prevent a person from doing a sedentary job, Dr. Kendrick replied, "Usually not" (R. 62), but made no comment as to whether the plaintiff's pain was or was not severe enough to rule out sedentary work.

### 2. No Explanation for Abandoning Limitations Incorporated into 2013 RFC

The ALJ also failed to explain what – if anything – caused him to wholly reject opinions by Dr. Gopal that he had previously accepted, at least in part. As noted above, Dr. Gopal consistently opined that plaintiff could not sit, stand or walk for more than a brief period before changing position. (R. 938-40, 994-95.) In his 2013 Decision, the ALJ gave that portion of Dr. Gopal's opinion "some weight," stated that "the ability to sit and stand at will was considered" (R. 201), and formulated an RFC that limited plaintiff to work that gave her "the option to stand for 15 minutes after sitting for 45 minutes." (R. 199.) In his 2016 Decision, the ALJ once again recited that he gave Dr. Gopal's opinion "some weight," and stated that "the ability to sit and stand at will was considered." (R. 25.) However, in formulating plaintiff's RFC, the ALJ did not include any sit/stand option or make any other concession to plaintiff's limitations in this regard. Nor did he explain why his views changed on this point, in the face of objective evidence that showed a worsening of plaintiff's spine condition.

Given that an ALJ must "comprehensively set forth [the] reasons for the weight assigned" to a treating physician's opinion, *Greek*, 802 F.3d at 375, this too was error. Moreover, the error was not harmless, because the sit/stand option eroded the occupational base for sedentary work and – as the Appeals Council noted when vacating the 2013 Decision – required "supplemental evidence from a vocational expert" to determine the extent of the erosion. (R. 214.) On remand, therefore, the ALJ must explain any evolution in his assessment of opinion evidence that he once deemed weighty enough to incorporate into plaintiff's RFC.

### 3. Improper Reliance on Ultimate Opinion Solicited from Non-Examining Medical Expert

The ALJ further erred when he relied on the testimony of the non-examining MEs – particularly Dr. Kendrick – as substantial evidence contradicting the opinions of plaintiff's treating

physician and supporting his ultimate conclusion of non-disability. An ALJ may decline to afford controlling weight to the opinion of a treating physician where that opinion is "not consistent with . . . the opinions of other medical experts." *Halloran*, 362 F.3d at 32. "However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Burgess*, 537 F.3d at 128. The opinion of a non-examining expert – particularly an opinion that is at odds with those of all of the examining physicians – rarely (if ever) rises to that level. *See Ridge*, 294 F. Supp. 3d at 61 (quoting *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995)) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician."); *Rodriguez v. Barnhart*, 249 F. Supp. 2d 210, 214 (E.D.N.Y. 2003) ("The testimony of Dr. Afalonis, the lone dissenting physician, who never examined Mr. Rodriguez, does not constitute substantial evidence to overcome the opinions of the treating physicians that he was disabled.").

In this case, the ALJ not only relied on the opinion of non-examining experts over treating and examining sources; he affirmatively solicited Dr. Kendrick to provide an opinion on an issue reserved to the Commissioner. At the final hearing, on November 18, 2015, Dr. Kendrick began his testimony by summarizing a portion of the medical record relating to plaintiff's physical impairments.[19] The ALJ then asked him, "Okay. From an objective standpoint, should she be able or not able to do the full range of light work?" (R. 59.) A moment later (after overruling counsel's objection), the ALJ asked a more detailed version of the same question:

> Based upon your review of the record, light work of course you have to be able to stand up to six hours in a day, to carry ten pounds frequently, that's up to six hours,

---

[19] Dr. Kendrick mentioned the 2010 MRI of plaintiff's lumbar spine and the 2012 MRI of her knee, but not the 2012 MRI of her lumbar spine, showing two lobular disc herniations impinging on the thecal sac and neural foramina bilaterally (R. 1012), or the 2014 MRI of her lumbar spine (R. 1008-09), showing central canal stenosis and neural foraminal stenoses. (R. 58.) It is not clear whether Dr. Kendrick (or any medical source other than Dr. Gopal) ever saw the 2014 MRI.

20 pounds occasionally. You're talking – not talking about, of course, six hours straight, you're talking about with breaks. That's a 15-minute break in the morning, 15 minute in the afternoon, half an hour for lunch. Based upon the objective evidence in the records, is there an impairment which would reasonably prevent somebody from doing that?

(R. 60.)

Dr. Kendrick responded, "Well absent her pain, she could do that easily." (*Id*.) The ALJ highlighted this testimony in his 2016 Decision (ignoring the "absent her pain" qualification, and inaccurately reciting that Dr. Kendrick testified that plaintiff should be able to perform "even medium work") as a basis for his conclusion that plaintiff could perform a full range of exertionally sedentary work with no other physical limitations. (R. 22, 26.)

The same regulation that generally requires ALJs to give more weight to opinions from treating sources than non-treating sources, and more weight to opinions from examining sources than non-examining sources, makes it clear that opinions as to a claimant's RFC "are not medical opinions" at all, 20 C.F.R. § 416.927(d), (d)(2), and thus are entitled to "no special significance." *Id*. § 416.927(d)(3). *See also Ryan*, 5 F. Supp. 3d at 510 ("no deference need be given to the conclusion [by a medical source] that a claimant has a particular RFC, *e.g.,* that a claimant is limited to performing sedentary work"); HALLEX 1-2-6-70(E) ("an ALJ may not ask an ME to . . . [d]ecide a claimant's RFC").

In this Circuit, a "failure to follow HALLEX does not necessarily constitute legal error." *Gallo v. Colvin*, 2016 WL 7744444, at *12 (S.D.N.Y. Dec. 23, 2016), *report and recommendation adopted sub nom. Gallo v. Comm'r of Soc. Sec.*, 2017 WL 151635 (S.D.N.Y. Jan. 12, 2017), and *report and recommendation adopted sub nom. Gallo on behalf of M.G. v. Comm'r of Soc. Sec.* (S.D.N.Y. Mar. 31, 2017). A failure to follow § 416.927(d), however, requires remand, unless the error is harmless. In this case, the error was not harmless: the ALJ solicited, accepted, and relied upon the opinion of a non-examining expert on a matter reserved for the Commissioner as

justification for giving less than controlling weight to the opinion of plaintiff's treating physician and as substantial evidence in support of his RFC formulation. Remand would therefore be required on this ground even if the ALJ had properly discounted Dr. Gopal's opinions for other reasons.

### F.      The ALJ's Decision Was Factually Flawed

In addition to the errors described above, the ALJ made a number of non-trivial factual errors with regard to the evidence before him. Most significantly, he mischaracterized Dr. Kendrick's testimony, reciting that the ME opined that plaintiff was able to perform "even medium work" (R. 26), when in fact Dr. Kendrick made no such statement. The ALJ also mischaracterized plaintiff's testimony in several respects, stating that she could "cook, drive, and negotiate public transportation independently." (R. 29.) In fact, plaintiff testified that she cooked and cleaned with the help of her teenaged son, who also did the shopping for her (R. 52-53, 82); that she had a driver's license but, at least as of November 18, 2015, did not drive (R. 51; *cf.* R. 409); and that she did not take public transportation without assistance due to pain. (R. 51.) She traveled to her hearings by cab (R. 51, 52, 168) and to her medical appointments by car service. (R. 173.)

Similarly, the ALJ misstated the medical record when he asserted that plaintiff's physical examinations revealed, among other things, an intact gait. (R. 24.) In fact, Dr. Gopal repeatedly noted that plaintiff presented with an antalgic gait. (R. 1015-16, 1018-19, 1021, 1024, 1027, 1029, 1031, 1035, 1038, 1041.) And while it is true that plaintiff generally found short-term relief from pain with heat and medication (R. 24), she just as frequently reported to her health care providers that her pain was not responding to treatment or was getting worse.[20]

---

[20] In the 2016 Decision, the ALJ cited to a February 3, 2011 treatment note from Emmanuel Gachette, M.D., which stated, under "History of Present Illness," that plaintiff's pain was "relieved by heat and pain meds/drugs." (R. 530.) That same day, however, plaintiff reported that her pain was "getting worse." (R. 532.)

If an ALJ commits "factual errors in evaluating the medical evidence," his decision denying benefits "is not supported by substantial evidence." *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996); *see also Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d Cir. 2009) (where the ALJ's credibility determination is based on factual errors, "we cannot say that it is supported by substantial evidence"); *Edel v. Astrue*, 2009 WL 890667, at *15 (N.D.N.Y. Mar. 30, 2009) (ALJ's finding is "not supported by substantial evidence where [the ALJ] relied primarily upon a misstatement of the record"); *Wilson v. Colvin*, 2016 WL 5661973, at *9 (W.D.N.Y. Oct. 3, 2016) (internal quotations omitted) ("although the ALJ provided 'specific' reasons for discounting Plaintiff's credibility, the Court cannot find that they were 'legitimate' reasons because they are based on a misconstruction of the record"). Moreover, while "[o]ne or two factual inaccuracies may amount to harmless error," *Chandler v. Soc. Sec. Admin.*, 2013 WL 2482612, at * 8 (D. Vt. June 10, 2013), numerous errors, particularly regarding matters upon which the ALJ relied, require remand. *Id.*; *see also Gomez v. Comm'r of Soc. Sec.*, 2017 WL 1194506, at *16 (S.D.N.Y. Mar. 30, 2017) (remanding where ALJ "made numerous factual errors, some of which were significant to his ultimate conclusion") (internal quotation marks and citations omitted).

In this case, the ALJ's factual errors were not trivial, and affected numerous aspects of his analysis, including the weight he gave to the medical opinion evidence before him, his evaluation of plaintiff's credibility, and his formulation of plaintiff's RFC. On remand, therefore, the ALJ must review the medical and non-medical evidence in the record, including any new evidence developed for or at new hearings, and ensure that his analysis is based on an accurate characterization of that evidence.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's motion is DENIED, plaintiff's motion is GRANTED, and the case is remanded to the Commissioner for further proceedings consistent with

this Opinion and Order, including a review of the medical and non-medical evidence in the record, a re-weighing of the opinion evidence as to plaintiff's physical impairments, and a redetermination of her RFC. Given that ALJ Grossman has already conducted four hearings in this matter and issued two decisions, both of which required remand, the Commissioner should consider whether to assign plaintiff's case to a different ALJ henceforth. *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (the decision as to whether to reassign on remand is ordinarily reserved to the Commissioner); *Gomez*, 2017 WL 1194506, at *21 (same; requesting that the Commissioner consider whether to reassign the matter on remand).

Dated: New York, New York
      March 12, 2019

**SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**